**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

Air America Flight Center, LLC,

                         Plaintiff,

           - against -

Eagle View Technologies, Inc., Sandhills Aviation
LLC, and Steven W. Sherwood,

                    Defendants.

No.

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Air America Flight Center, LLC ("Air America"), by and through its undersigned counsel McDermott Will & Emery LLP, submits this Complaint against Defendants Eagle View Technologies, Inc. ("Eagleview"), Sandhills Aviation LLC ("Sandhills"), and Steven W. Sherwood (collectively the "Defendants"). This Complaint is filed as a related action to *Pictometry International Corp. v. Air America Flight Center, LLC*, No. 6:18-cv-6487, currently pending before the Honorable Elizabeth A. Wolford, in which Air America simultaneously filed counterclaims against Pictometry, which are related to the allegations contained herein.

## NATURE OF ACTION

1.     Air America is an aviation business that provides, among other things, aircraft fleet services and logistical support services to the aerial imagery capture industry. Air America also operates a flight school where pilots are trained so that they may be properly licensed and so that they may provide services to the aerial image capture industry. Air America provides best in class aircraft fleet services and logistical support services, and its confidential and proprietary methods for maintaining and operating its fleet allow Air America to provide more flight hours than its competitors, year over year. Moreover, Air America has developed relationships across

the country that allow it to fly aircraft in situations and places that its competitors simply cannot replicate.

2.      Since Air America's founding in 2004, it has operated with a small logistics team, with very few senior managers that manage the fleet's operations.  At the same time, it has built up a national roster of hand selected and qualified pilots (and often training these pilots) and third-party aircraft maintenance workers, many of which are specially qualified to fly and maintain aircraft that provide flight services for aerial imagery capture.  Air America has made a substantial investment of time, money, and energy in training as well as building and cultivating Air America's relationships with those pilots and maintenance workers.

3.      Air America and Pictometry worked together for nearly thirteen years.  Air America supported Pictometry's aerial imagery capture business with a fleet of aircraft and managed the logistics of keeping those planes airborne so that Pictometry could capture aerial images for its customers.

4.      Upon information and belief, on January 7, 2013, Pictometry merged with a company named Eagleview into a single entity and they currently maintain essentially identical senior management and key employees.  Therefore, for at least the last five years of the relationship between Air America and Pictometry, upon information and belief, Eagleview and Pictometry were the same company and benefited from Air America's services.

5.      From October 2012 to October 2014, Steven W. Sherwood was part of Air America's small senior management team and one of the few individuals who had access to Air America's hiring criteria and processes, training materials, logistics management processes, engineering data, flight school operations, and customer, pilot, and mechanic relationships. Mr. Sherwood was specifically trained to take over responsibility for major parts of Air

2

America's business.  Air America put significant trust and confidence in Mr. Sherwood and made him principally responsible for managing Air America's relationship with and operations for Pictometry.

6.      Over the course of the Pictometry–Air America business relationship, Pictometry employees from time to time expressed concerns over being too dependent upon Air America as an aircraft fleet services vendor and stated that there was a need for Pictometry to establish relationships with other aircraft fleet services vendors.  Other vendors, however, would not be able to provide Pictometry with the same quality of trained pilots, management expertise, efficient deployment of aircraft, and ability to get the most difficult assignments completed as Air America could because of Air America's professional network, knowledge and experience.

7.      Unable to replicate Air America's expertise, Pictometry and Eagleview poached Mr. Sherwood from Air America for the express purpose of creating a new, direct competitor to Air America.  On information and belief, Pictometry, Eagleview and Mr. Sherwood devised a plan by which Mr. Sherwood would start a new venture – Sandhills – that would attempt to replicate the services Air America provided for Pictometry.  Mr. Sherwood went forward with this plan despite owing Air America a duty of loyalty and a fiduciary duty.  Pictometry and Eagleview aided and abetted, and, indeed, induced Mr. Sherwood's breaches of these duties to Air America.

8.      Sandhills required significant up-front capital to get its business started, including to purchase (or lease) aircraft and to establish a base of operations.  On information and belief, Pictometry and Eagleview provided Mr. Sherwood and Sandhills with the start-up capital (or helped arrange for the start-up capital) necessary to quickly set up a new business capable of providing the same level of services as Air America.  Sandhills started operating within months

3

of Mr. Sherwood's resignation from Air America.  At the time he left Air America, Mr. Sherwood did not have the financial wherewithal to accomplish this without significant backing from Pictometry and Eagleview.

9. As a result of Sandhills entering the market, Air America lost revenue from Pictometry and opportunities to expand the relationship with Pictometry.  Sandhills also competes with Air America for business outside of the United States.  Air America has been damaged as a result.

10. This was not the only time that Pictometry and Eagleview took confidential information and/or trade secrets from Air America to further its business at the expense of Air America.

11. On April 21, 2016, Pictometry offered and Air America orally agreed that Air America would be Pictometry's exclusive vendor for flying planes deploying the aerial imagery technology Pictometry acquired (or then was in talks to acquire) from an Australian company called Spookfish Limited ("Spookfish").

12. In reliance on this promise, Air America had a number of meetings with Pictometry (and Spookfish) personnel about how to best deploy Spookfish's survey camera technology (which was referred to as the "Pod") and the type of aircraft that should be used to deploy the Pod.  After many discussions, Pictometry and Eagleview abandoned their original plan to use Cessna Caravan aircraft and, instead, took Air America's recommendation to use the Piper Aztec to deploy Spookfish's technology.

13. Air America was the subject matter expert for everything that concerned the Aztec platform for Pictometry and how this model of Aircraft would be used to deploy the Pod. In the following months, Air America provided Pictometry personnel with a substantial amount

of data so that the Spookfish Pod could be tailored for use on a Piper Aztec in the United States.

14.    In December of 2016, Air America (at Pictometry's request) and Pictometry personnel flew to Australia to meet with personnel from Spookfish and a company associated with Spookfish called Innov.aero. Air America personnel consulted with Spookfish personnel to discuss the Aztec platform and how it would be viable for deploying the Pod in the United States. During that trip to Australia, Air America described to Spookfish and Pictometry a number of different physical modifications that Spookfish's engineers had not yet addressed or even anticipated but that were required so the Pod could be installed on the Aztec and the Aztec could operate in the United States.

15.    The plans devised by Air America were well received and over the next few months, Air America acquired an Aztec on which to install the Pod and, thereafter, to conduct test flights. In March 2017, Air America installed the test Pod on the belly of a Piper Aztec aircraft bearing tail number N62553 (the "Spookfish Airplane").

16.    Prior to this installation, no set of procedures existed to accomplish the installation. Innov.aero shipped the Pod and its rig to Air America and sent some personnel to assist. Because Innov.aero and/or Spookfish ignored Air America's advice to make certain modifications, Air America used its knowledge and expertise to make a number of different modifications to the Aztec aircraft required to install the Pod and to ensure that it could actually operate commercially in the United States. During this process, Air America corrected numerous errors and problems with the Pod. Indeed, several issues required Air America to modify and redesign some of the Aztec's electrical and mechanical systems so that the Pod could actually function and capture images in the United States.

17.    Innov.aero documented these procedures and created a manual that Air America

believed would be used for future installations of additional Spookfish Pods on *Air America aircraft*.  Air America understood and expected that its installation methodology would be kept confidential and (as discussed herein) Air America did this work in reliance upon Pictometry's promise that Air America would be the exclusive vendor for Pictometry when it came to deploying Spookfish technology in the United States.

18.     Pictometry played no active role in the installation.

19.     After the test Pod was installed on the Spookfish Airplane, Air America and Pictometry conducted a series of test flights in accordance with the limitations placed on the aircraft by the Federal Aviation Administration ("FAA") and the Federal Communications Commission ("FCC"), as it was only permitted to fly under a special experimental airworthiness certificate.  Notably, this certificate did not permit commercial operation.  During these test flights, the Pod experienced a number of mechanical failures, all of which were solved by Air America and its network of independent contractors.

20.     Air America was only provided an opportunity to install a single Spookfish Pod on the Spookfish Airplane.[1]  In 2017, Air America learned Pictometry had started deploying Spookfish's technology on other aircraft and with vendors other than Air America.  Clearly, Pictometry broke its promise of exclusivity to Air America by using other vendors to fly Spookfish-related technology.

21.     In fact, Air America has learned that Pictometry and Sandhills have installed a Spookfish Pod upon a Piper Aztec bearing N53AC (the "Sandhills Pod Aircraft").  The Sandhills Pod Aircraft registration was signed by defendant *Steven W. Sherwood*.  A review of available

---

[1] A second Pod was shipped to Air America and steps were taken to install it on a Piper Aztec but those plans were not completed because the relationship with Pictometry broke down before the second Pod could be installed.

information appears to show that the Pod was installed on the Sandhills Pod Aircraft using the methodology devised by Air America and includes the very types of parts that Air America designed. Apparently, Pictometry found a way to obtain the manual Innov.aero created – documenting Air America's methods – and passed it along to another vendor without Air America's knowledge or consent.

22.     Not only did Pictometry, Eagleview and Mr. Sherwood take Air America's information to start Sandhills, but Pictometry and Eagleview also took Air America's confidential information and trade secrets for installing the Pod so that Sandhills could supplant Air America as a vendor to Pictometry and deprive Air America of the business opportunity of partnering with Pictometry for the deployment of the Pod.  These acts cost Air America millions of dollars in revenue and/or substantial royalties.

**PARTIES AND RELEVANT NON-PARTY**

23.     Air America is a Florida limited liability company with a principal place of business at 1585 Aviation Center Parkway, Hangar 602, Daytona Beach, Florida 32114.  Melissa M. Booth is Air America's managing member and is domiciled in Florida.  Jacklyn Booth is the only other member of Air America and is domiciled in New York.

24.     Pictometry is a Delaware corporation with a principal place of business at 25 Methodist Hill Drive, Rochester, New York 14623.  Pictometry is a non-party to this complaint, but is the Plaintiff and counter-claim defendant in a related action, titled *Pictometry International Corp. v. Air America Flight Center, LLC*, No. 6:18-cv-6487.

25.     Eagleview is a Washington corporation with a principal place of business at 3700 Monte Villa Pkwy, Suite 200, Bothell, Washington 98021.

26.     Sandhills Aviation, LLC, is a Nebraska limited liability corporation with a

principal place of business at Wahoo Municipal Airport, 1464 East 34th Street, Wahoo, Nebraska 68066.  Steven Sherwood is a Member of Sandhills and is located at 5340 N. 11th Street, Lincoln, Nebraska 68521.  David Keith Bentley is a Member and is located at 2515 S. 148th Street, Omaha, Nebraska 68144-2028.

27.     Steven W. Sherwood is an individual that resides at 5340 N. 11th Street, Lincoln, Nebraska 68521.

**JURISDICTION, VENUE AND CHOICE OF LAW**

28.     This Court has subject matter jurisdiction over Eagleview, Sandhills, and Mr. Sherwood pursuant to 28 U.S.C. § 1331, as this case arises under federal law, 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000, and 28 U.S.C. § 1367, because supplemental jurisdiction is warranted over the necessary state law causes of action.

29.     This Court has personal jurisdiction over the Defendants because they are engaged in continuous and systematic business with Pictometry in this judicial district.

30.     Further, personal jurisdiction is proper over the Defendants because the Defendants all "transact business" in the State of New York, under CPLR 302(a)(1).

31.     In addition, as stated on the Sandhills website, the Defendants all do business in Rochester, New York.  *See* Sandhills Aviation, *About Us*, *Past Projects*, https://sandhillsaviation.com/about/past-projects/ (listing "Rochester, New York" as a location of one of Sandhill's past projects).

32.     Venue is proper in this district under 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claims asserted herein occurred in this judicial district.

33.     Air America is organized under the laws of the State of Florida and all injuries to

Air America arising out of Defendants' tortious conduct have been incurred in the State of Florida, therefore Florida substantive law applies to, at least, the state law claims alleged herein for breach of the duty of loyalty, breach of fiduciary duties, aiding and abetting such breaches of the duty of loyalty and other fiduciary duties, and the Florida Deceptive Trade and Unfair Practices Act. All other causes of action are governed by Federal law.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     Air America and Pictometry

34.     Melissa M. Booth founded Air America in 2004. Since 2005, Air America has been providing aircraft fleet management and logistics services for the deployment of aerial imaging equipment. Air America traditionally operated imaging aircraft in the continental United States and Alaska, as well as parts of Canada, Mexico, the Bahamas, Puerto Rico, Haiti, and the Dominican Republic. Over the course of the last thirteen years, Air America has trained and hired hundreds of pilots, many of whom are military veterans, to provide services to its customers.

35.     In 2005, Air America approached Pictometry, an aerial imagery company. Pictometry was seeking the services of a vendor that owned a sufficient number of aircraft upon which Pictometry's equipment and cameras could be installed and then flown. Air America was able to provide such services. Although Pictometry had the imaging equipment, it did not (and still does not) own planes or possess the knowledge and expertise needed to manage the logistics of a fleet of aircraft or to find and train qualified pilots to fly the aircraft. In order for Pictometry to actually collect aerial images for commercial use, it depends on companies like Air America.

36.     Under a series of successive identical contracts called Air Services Agreements, *i.e.*, ASAs, (the latest of which was executed in September 2015 and recently not renewed),

Pictometry hired Air America to provide the aircraft and manage the logistics (including training and hiring qualified, reliable pilots) necessary to operate the aircraft and collect aerial images for Pictometry.

37.    Over the past thirteen years, Pictometry has been Air America's largest customer. On information and belief, Air America was Pictometry's largest aircraft fleet services vendor in terms of both number of aircraft and flight hours.  Indeed, Air America was Pictometry's "go-to" vendor for the toughest assignments as its pilots were the best trained pilots in the business and Air America's professional network meant it knew how to navigate the FAA, Department of Energy, NASA, NAFTA, and Transport Canada bureaucracy to fly in areas others simply could not fly.

38.    Over time, the parties developed a profitable relationship that was, in many respects, symbiotic.  The companies had different, but complementary expertise.  Unfortunately, Pictometry came to believe that this relationship was somehow a threat to Pictometry's business as Pictometry was becoming increasingly reliant upon Air America.  Without Air America's flight services, or flight services from a vendor with the same expertise, Pictometry's cameras and equipment could not actually be airborne and, thus, would not be able to capture images for Pictometry's customers.

39.    On information and belief, Pictometry sought alternative vendors to keep its business flexible and was willing to go to great (and improper) lengths to diversify its vendor base.

**B.    Pictometry, Eagleview and Spookfish**

40.    Pictometry was founded in 1996.  Pictometry is an aerial imaging company, specializing in processing images that are captured from aircraft and commercializing those

10

images into a sellable product.

41.     Eagleview was founded in 2008.  Eagleview provides, among other things, remote aerial roof measurement services.

42.     On information and belief, on January 7, 2013, Eagleview and Pictometry merged.

43.     On information and belief, Eagleview and Pictometry maintain essentially identical senior management and key employees.  For example, Rishi Daga is the president of Pictometry and Eagleview.  By way of further example, Frank Giuffrida is the Senior Vice President of Capture Systems at Pictometry as well as the Executive Vice President of Engineering at Eagleview.

44.     In 2015, venture capital fund Vista Equity Partners purchased Eagleview.

45.     On information and belief, since their merger, Eagleview and Pictometry have received significant investments from other private equity funds and investment companies.

46.     In 2016, Eagleview and Pictometry entered into an agreement with an Australian technology company called Spookfish.  Spookfish describes itself as, among other things, an image capture technology company that works in the geospatial imagery market.

47.     On June 27, 2018, Clearlake Capital Group, L.P. made a significant equity investment in Eagleview and Pictometry.  (Attached hereto as Exhibit A is a true and correct copy of an Eagleview press release, dated June 27, 2018, announcing the Clearlake Capital Group, L.P. investment.)

48.     Following the Clearlake investment, Eagleview CEO Rishi Daga stated "Eagleview now enjoys the substantial backing of two of the most sophisticated technology investors in the world, both of which focus on helping their portfolio companies achieve

11

maximum performance potential." (Ex. A, at 1.)

49. On July 26, 2018, Eagleview reported that it had acquired Spookfish. (Attached hereto as Exhibit B, is a true and correct copy of an Eagleview press release, dated July 26, 2018, announcing its purchase of Spookfish.) The press release announcing the transaction indicates that Eagleview made a 100% cash offer which provides a 56.9% premium of the last closing price for the Spookfish shares. (Ex. B, at 1.)

50. According to publicly available sources, Spookfish was valued at $90,000,000 when it was acquired by Eagleview and Eagleview paid $80,300,300 in cash for the equity interest in Spookfish. (Attached hereto as Exhibit C, is a true and correct copy of an article titled "EagleView aerial imagery venture acquiring Australia's Spookfish, valued at $90m" and dated July 26, 2018, describing the transaction.)

**C. Air America Hires Steven W. Sherwood, Promotes Him to Assistant Director of Business Development and Puts Him in Charge of Managing the Pictometry Account**

51. As discussed above, Air America pilots are hired from around the country, trained by Air America, and then serve as independent contractors to Air America.

52. One such independent contractor was Mr. Sherwood, who was first hired by Air America as a pilot, on October 15, 2008.

53. When he was first hired as a pilot, Mr. Sherwood was assigned to fly aircraft for Pictometry projects and to capture images for Pictometry.

54. Mr. Sherwood operated as an independent contractor pilot from October 15, 2008 through October 26, 2009. He later returned to Air America as an independent contractor pilot from April 25, 2011 to January 25, 2012.

55. On October 8, 2012, Mr. Sherwood was hired by Air America as a full time senior

manager with the title of Assistant Director of Business Development.

56.     Hiring Mr. Sherwood was significant for Air America.  Air America maintains only a few full time employees.  But, when it does hire someone, that employee is given substantial responsibility over Air America's operations and business.

57.     In his role as Air America's Assistant Director of Business Development, Mr. Sherwood had responsibility over human resources, hiring pilots, and training pilots.  He also was given significant training and responsibility with respect to managing the Air America fleet of aircraft for Pictometry.  Mr. Sherwood was provided access to all of Air America's hiring processes and criteria for pilots and mechanics, its training materials, fleet management and logistics procedures, engineering data, flight school operations, and its customer, pilot, and mechanic relationships.

58.     Mr. Sherwood's principal responsibilities were fulfilling the needs of Pictometry, providing status updates and reports to Pictometry, and generally maintaining the relationship between Air America and Pictometry.  During this time, Mr. Sherwood was taught Air America's methods for deploying aircraft.  In particular, he learned the methods that Air America has developed over the prior (at the time) seven years to ensure that aircraft are flown and maintained in such a way that Air America provides more flight hours than its competitors, year over year.  Air America's high number of reliable flight hours, in turn, gave Pictometry a substantial advantage over its competitors and allowed a significantly higher number of images to be captured than would have been possible without Air America's logistics, training, maintenance, and management expertise.

59.     During the course of Mr. Sherwood's employment as Air America's Assistant Director of Business Development, Mr. Sherwood accepted the duty, obligation and opportunity

13

to manage the relationship with Air America's most important client, Pictometry.

60.     On behalf of Air America, Mr. Sherwood was in close contact with senior management of Pictometry.

61.     Specifically, Mr. Sherwood was in close contact with, among others, Pictometry's Pat Blankfard, Kim Roberts, Eben Meyer, Steve Schmidt, and Dan Applegate.

62.     As Pictometry was Air America's largest customer, Air America placed substantial trust and confidence in Mr. Sherwood to fulfill Pictometry's needs and to maintain the relationship between Air America and Pictometry.

63.     During the course of Mr. Sherwood's employment, he became privy to secret and proprietary information about Air America.  Mr. Sherwood was entrusted with, among other things, the following confidential Air America information:  (i) internal policies on screening, hiring, training, and managing pilots; (ii) Air America's practices on creating and executing flight routes; (iii) Air America's expertise on managing complicated flight projects and the corresponding maintenance schedules of the Aircraft; (iv) Air America's nationwide rosters of independent contractor pilots and mechanics; and (v) Air America's practices for servicing and maintaining the Pictometry account.

**D.     Pictometry, Eagleview and Mr. Sherwood Work Together to Start a New Company to Directly Compete with Air America**

64.     On information and belief, during the course of Mr. Sherwood's tenure as Air America's Assistant Director of Business Development, Mr. Sherwood communicated with senior management of Pictometry.  Pictometry, Eagleview and Mr. Sherwood agreed to take the confidential information and methods Mr. Sherwood learned at Air America to start a competing aircraft fleet services vendor for the purpose of diverting revenue and profits away from Air America.  Mr. Sherwood would accomplish this through a new company called Sandhills.

14

Pictometry would benefit by creating an alternate vendor to Air America.

65. Mr. Sherwood owed a duty of loyalty to Air America and was trusted to manage the Pictometry account, but he breached that duty when he started a new venture to take Pictometry business away from Air America using the confidential information he was privy to in his role as a senior manager of Air America.

66. During his employment, Mr. Sherwood engaged in disloyal acts in anticipation of his planned future competition with Air America, including gathering and using confidential information acquired during the course of his employment, soliciting pilots and employees prior to the end of his employment, and conspiring with Air America's largest customer to divert business away from Air America for his own financial benefit.

67. On October 9, 2014, Mr. Sherwood resigned from Air America.

68. When Mr. Sherwood resigned, he told Air America's senior management that he was resigning for personal reasons. It quickly became clear that this was not true.

69. In reality, Mr. Sherwood resigned so he could start a competing business against Air America. Mr. Sherwood engaged in this endeavor at the direction and/or with the assistance of Pictometry and Eagleview. As part of Mr. Sherwood's business plan to compete with Air America, Mr. Sherwood started recruiting Air America's pilots and personnel.

70. One such person was David Smith.

71. On October 15, 2008, Air America hired Mr. Smith as an independent contractor and he worked primarily on the Pictometry account.

72. During the course of his work with Air America, like Mr. Sherwood, Mr. Smith regularly spoke with senior management from Pictometry.

73. During the course of his employment, Air America entrusted Mr. Smith with the

15

following secret Air America information:  (i) internal policies on hiring and managing pilots; (ii) Air America's practices on creating and executing flight routes; (iii) Air America's expertise on managing complicated flight projects; and (iv) how Air America serviced and maintained the Pictometry account.

74.     At the direction and encouragement of Pictometry, Eagleview and Mr. Sherwood, Mr. Smith agreed to become a founding member of Sandhills, the business that would compete with Air America and service Pictometry.

75.     Mr. Sherwood signed the Articles of Organization of Sandhills Aviation, LLC on May 24, 2015, which lists Steven Sherwood, David Smith and Jason Dean Janzen as managing members.  The Amended Certificate of Organization of Sandhills Aviation, LLC, dated August 3, 2015 removed Jason Dean Janzen as a member, and the Amended Certificate of Organization, dated November 1, 2015 added David Bentley as a member and removed David Smith as a member.  (Attached hereto as Exhibit D is a true and correct copy of Sandhills' Articles of Organization, dated May 24, 2015, the Amended Certificate of Organization, dated August 3, 2015, and the Amended Certificate of Organization, dated November 1, 2015.)

76.     Since starting Sandhills, Mr. Sherwood and/or Mr. Smith recruited other Air America pilots based on the recruiting and hiring materials developed by Air America.  For example, Mr. Sherwood convinced Michael Herbert, a former Air America pilot, to become a pilot for Sandhills.  As another example, Mr. Sherwood convinced James Szydlowski, a former Air America pilot, to become a pilot for Sandhills.

77.     Upon Mr. Sherwood's resignation, Air America personnel reviewed Mr. Sherwood's email account and electronically stored information.

78.     At that time, Air America Chief Flight Instructor Sean Freeman (who also

managed Air America's email accounts) was asked by Air America senior management to review Mr. Sherwood's Air America email account.

79.    When Mr. Freeman reviewed the contents of Mr. Sherwood's account, Mr. Freeman found that all of the emails (including the sent mail) in the account had been deleted.

80.    No other Air America employee accessed Mr. Sherwood's email account.

81.    Given the fact that no other employee accessed Mr. Sherwood's email account, on information and belief, Mr. Sherwood deleted the contents of his Air America email account after taking Air America's confidential information so he could hide his duplicitous acts.

82.    Upon starting its operations, Sandhills touted publicly that it had been formed at the direction of Eagleview and Pictometry.

83.    As late as October 29, 2016, the Sandhills website stated:  "Sandhills Aviation was founded in May of 2015, *as a direct response to a request by Eagleview/Pictometry* for the need to bring on additional vendors for the purpose of data acquisition."  (emphasis added). (Attached as Exhibit E is a true and correct copy of a screenshot of the Sandhills website taken on October 29, 2016.[2])

84.    Sometime after October 29, 2016, Sandhills altered its website, deleting the statement that the request to start Sandhills was at the direction of Eagleview.  The new iteration of the website states: "Sandhills Aviation, LLC was founded in May 2015 *upon the request from Pictometry International, Inc.* to expand their current fleet capabilities." (Emphasis added).  (Attached as Exhibit F is a true and correct copy of a screenshot of the Sandhills website

---

[2] This screen-shot was taken by the "Internet Archive WayBackMachine," an online service that takes pictures of websites so that prior iterations of those websites are available to the public. https://archive.org/web/.

accessed on September 3, 2018.)

85.    Sandhills publicly touts the fact that Mr. Sherwood worked with Pictometry during his time at Air America.  Indeed, to this day, the Sandhills website states:  "Our founders, who had worked directly with Pictometry in some shape or fashion since 2007, [are] excited about the prospect of working with a growing successful company."  (Ex. F.)

86.    The statement that Mr. Sherwood had previously worked "directly with Pictometry in some shape or fashion since 2007" refers to Mr. Sherwood's employment with Air America, where he was supposed to be working for Air America and managing the relationship between Air America and Pictometry.

87.    Sandhills also publicly touts the relationship between Sandhills, Pictometry and Eagleview.  The Sandhills website states:  "Our primary client is Pictometry International, part of Eagleview Technologies, which is on the forefront of the geospatial world."  (Ex. F.)

88.    Sandhills and Air America are competitors as they are both aircraft fleet service vendors operating and vying for the same business.  Sandhills has been wrongfully using Air America's confidential information and trade secrets since its inception to the present day to compete with Air America.  Indeed, until recently, both Air America and Sandhills provided nearly identical services for Pictometry.

89.    As described herein, one of Air America's key distinguishing factors from its competitors is its expertise of the use and mechanics of the Piper Aztec model aircraft.  The Piper Aztec is a twin engine, light utility aircraft that is very well suited for aerial imagery capture applications.

90.    On information and belief, Sandhills recently acquired approximately 20 Piper Aztecs and is currently seeking to hire more pilots with experience flying the Piper Aztec.

18

91.    In a job posting titled "Job: Aerial Imaging Pilot," Sandhills seeks pilots that have "Cessna 172, Piper Aztec flight experience, 500hr total time and 50 hrs+ in the past 6 months preferred." (Attached hereto as Exhibit G is a true and correct copy of a screenshot of the Sandhills job posting accessed on September 3, 2018.) These are the same criteria Air America seeks, as a baseline, for its pilots.

92.    Once Sandhills opened, Sandhills assumed a significant amount of services from Pictometry that otherwise would have been handled by Air America.

93.    As soon as Sandhills was operational, Air America's revenue from Pictometry decreased as Pictometry posted flight requests and assignments to all its vendors (using an internal messaging system) and Sandhills provided flight services that historically would have been provided by Air America.

94.    The decrease in revenue received by Air America from Pictometry was due to business that was diverted to Mr. Sherwood and Sandhills.

95.    On information and belief, Sandhills performs approximately $190,000 worth of aircraft fleet vendor services for Pictometry every month. These aircraft fleet vendor services were previously performed by Air America and would have been performed by Air America had Pictometry/Eagleview not financially propped up Sandhills to become a direct competitor to Air America.

96.    Due to the actions of Pictometry, Eagleview, Sandhills and Mr. Sherwood, Air America has lost approximately $190,000 a month in business from Pictometry. Since Sandhills' founding in May 2015, this translates to approximately $7.4 million in lost revenue.

97.    In sum, at the direction of Pictometry and Eagleview, Mr. Sherwood stole confidential and proprietary information, employees, and pilots and started a competing flight

19

center to divert revenue from Air America into his own pockets and for the benefit of Pictometry and Eagleview.

**E.     Pictometry Promised Air America that It Would be the Exclusive Service Provider for Spookfish Technology But After Air America Helped Figure Out How to Install the Pod on a Piper Aztec, Pictometry Breached Its Promise and Gave Air America's Installation Methodology to Other Vendors, Including Sandhills**

98.     On April 21, 2016, senior management of Pictometry and Air America met to discuss the deployment of Spookfish technology on Air America aircraft.

99.     At this meeting, Pictometry promised Air America that Air America would be Pictometry's exclusive Air Services provider for projects involving deployment of Spookfish technology.

100.     Air America verbally accepted this offer.

101.     Thereafter, and in reliance on this agreement, Air America performed certain tasks for Pictometry without a written contract.

102.     After this initial meeting in April, Air America and Pictometry engaged in a series of meetings and conversations about the best aircraft platform to use for deploying the Spookfish Pod.  This camera system was not like Pictometry's technology insofar as it had to be installed on the belly of the aircraft (as opposed to Pictometry's technology, which was installed inside the aircraft with the camera positioned through a hole in the aircraft floor).

103.     The best aircraft options identified by Pictometry at that time were either the Cessna 208 Caravan or the Cessna 206 Stationair.  After hearing some preliminary details about the Spookfish technology, its operational needs, and how it would work, Air America explained why the Piper Aztec was a superior option for deploying Spookfish technology.  After many discussions, Pictometry abandoned its original plan to use the Cessna Caravan and, instead, took Air America's recommendation to use the Piper Aztec for deploying Spookfish technology.

20

104.    Thereafter, Air America was Pictometry's expert concerning the use of the Piper Aztec to deploy Spookfish technology.  As discussions progressed, Air America provided Pictometry personnel with substantial amounts of data, such as weight balances and electric power capabilities, so that solutions could be devised to tailor the Pod for use upon a Piper Aztec.

105.    In December 2016, Air America and Pictometry personnel flew to Australia to meet with personnel from Spookfish and a company associated with Spookfish called Innov.aero.  Air America personnel explained to Spookfish and Innov.aero personnel that the Piper Aztec was the best option for deploying Spookfish technology.  During that trip to Australia, Air America also advised Spookfish and Pictometry of the necessary physical modifications to the Aztec that must be performed in order to deploy Spookfish technology commercially in the United States.  This advice was, to Pictometry's detriment, not always followed.

106.    In March 2017, Innov.aero shipped the Pod and its rig directly to Air America. Innov.aero sent over personnel to assist in its installation.  Unfortunately, certain modifications suggested by Air America were ignored and still needed to be made by Air America.

107.    In March 2017, Air America used its knowledge and expertise to modify the aircraft and install the Pod on the Spookfish Airplane.  The installation was accomplished after a significant amount of Air America's time and effort.  Air America kept this work confidential by limiting the number of people who had access to this work and using non-party mechanics that were under pre-existing confidentiality agreements.  The modifications to the aircraft itself were complicated and needed to be approved by the FAA.  During this process, Air America corrected numerous errors and problems with the Pod design and several issues required Air America to

21

redesign some of the physical parts of the Pod's rig and to modify the Aztec's electrical and mechanical systems so that the Pod could actually function as designed.

108. Innov.aero documented the procedures that Air America developed. Air America understood that Innov.aero was preserving the methods Air America devised so that it could create a manual for future installations. Because Pictometry had promised Air America exclusivity for Spookfish Technology projects, Air America fully understood and believed that the manual was going to be kept confidential and used for future installations of additional Spookfish Pods upon *Air America* aircraft.

109. Pictometry did not provide any assistance to Air America during the installation process. Pictometry did not have the mechanical or engineering expertise on staff to understand or otherwise contribute to the installation process.

110. After the test Pod was installed on the Spookfish Airplane, Air America and Pictometry conducted a series of test flights in accordance with the limitations placed on the aircraft by the FAA and FCC, as it was flying under a special experimental airworthiness certificate. During these test flights, the Pod experienced a number of mechanical failures, all of which were solved by Air America or its independent contractor mechanics.

111. This was the only Pod Air America installed. In 2017, Air America learned that Pictometry was deploying Spookfish's technology – up to an additional 10 Pods – on other aircraft and with vendors other than Air America. Clearly, Pictometry broke its promise of exclusivity to Air America by using other vendors to fly Spookfish-related technology.

112. In fact, Pictometry and Sandhills have installed a Spookfish Pod on the Sandhills Pod Aircraft. The Sandhills Pod Aircraft registration was signed by *Steven W. Sherwood*.

113. A review of available information appears to show that the Sandhills Pod Aircraft

installed the Pod using the methodology devised by Air America and includes the very types of parts that Air America designed.  Not only did Pictometry and Eagleview and Mr. Sherwood take Air America's information to start Sandhills, but Pictometry and Eagleview also took Air America's confidential information and trade secrets for installation of a Spookfish Pod so that Sandhills could supplant Air America as a Pictometry vendor and deprive Air America of the business opportunity of partnering with Pictometry for the deployment of the Pod.

114.    At least one additional vendor (and possibly up to three) is using the Pod and it is likely that these vendors are also using Air America's installation method.  Air America pilots have seen personally saw Piper Aztecs with Pods rigged to their bellies – using the same method that Air America devised for Pictometry – at airfields around the United States.

115.    In sum, Air America expended significant time, effort and expense to develop the methodology of modifying a Piper Aztec so that a Spookfish Pod could be installed on it for commercial use.  Pictometry and Eagleview took that information – without Air America's permission – and shared it with other aircraft fleet service vendors, including Sandhills. Pictometry's, Eagleview's, Mr. Sherwood's and Sandhills' misappropriation of Air America's trade secrets has caused Air America significant damages.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### MISAPPROPRIATION OF TRADE SECRETS PURSUANT TO 18 U.S.C. § 1831, *et seq.*
### (As Against Eagleview, Sandhills, and Sherwood)

116.    Air America repeats and restates the above stated allegations as if fully restated herein.

117.    Eagleview, Sandhills, and Sherwood have, individually and collectively, violated the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*.

118.    Air America developed fleet management methods to ensure that aircraft are flown and maintained in such a way that Air America aircraft log more flight hours, year over year, than its competitors, which allows a significantly higher number of aerial images to be captured.  Air America also expended significant time, effort and money to develop hiring and training processes and criteria for pilots and mechanics, its training materials, fleet management and logistics procedures, engineering data, flight school operations, and its customer, government, pilot, and mechanic relationships.

119.    In addition, Air America developed the methodology of installing the Spookfish Pod on a Piper Aztec.  Air America expended significant time, effort and money to develop the methodology for installing the Spookfish Pod on a Piper Aztec.

120.    Neither Air America fleet management techniques, maintenance techniques and logistic procedures nor the method for installing the Spookfish Pod on a Piper Aztec are a matter of general knowledge or otherwise publicly available, but rather are proprietary to Air America and constitute trade secrets.

121.    Air America provided Pictometry, Eagleview and Mr. Sherwood with access to its trade secrets and other confidential information with the understanding and expectation that Pictometry, Eagleview and Mr. Sherwood would keep that information secret.

122.    Eagleview and Mr. Sherwood misused and/or wrongfully acquired Air America's trade secrets and confidential information and used Air America's trade secrets and confidential information to launch Sandhills and so that Pictometry and Eagleview could install a Spookfish Pod on a Piper Aztec, *i.e.*, the Sandhills Pod Aircraft. The improper use of these trade secrets has been ongoing since they were first misappropriated and continues today.

123.    Eagleview, Sandhills, and Mr. Sherwood's wrongful acquisitions amount to

misappropriation through improper and unlawful means, including but not limited to theft, and were intentional, knowing, willful, malicious, fraudulent, and oppressive.

124. The methodologies devised by Air America for flight management and for installing the Pod derive actual and potential independent economic value from not being generally known, and not being readily ascertainable through proper means by another person who can obtain economic value from disclosure or use of such information, such as Pictometry, Eagleview, Sandhills, Mr. Sherwood or other competitors of Air America who Pictometry and Eagleview share the information with for purposes of installing additional Spookfish Pods.

125. Air America keeps this information and trade secret information confidential by limiting the number of people with access to the information and requiring the execution of non-disclosure agreements.

126. As a direct and proximate cause of the actions of Eagleview, Sandhills, and Mr. Sherwood, Air America has suffered and continues to suffer damages, including the opportunity to fly for Pictometry, fly Spookfish Pods for Pictometry or the opportunity to license or otherwise collect a royalty for Eagleview's, Sandhills', or Mr. Sherwood's use of the method developed by Air America for installing the Pod on a Piper Aztec.

127. The conduct at issue relates to and affects interstate and foreign commerce because Eagleview planned to fly Spookfish technology worldwide and across the United States using the methodology devised by Air America for installing the Spookfish Pod on a Piper Aztec.

128. As a result, Air America has been damaged in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**MISAPPROPRIATION OF TRADE SECRETS**
**(As Against Eagleview, Sandhills, and Sherwood)**

129. Air America repeats and restates the above stated allegations as if fully restated herein.

130. Air America developed fleet management methods to ensure that aircraft are flown and maintained in such a way that Air America aircraft log more flight hours, year over year, than its competitors, which allows a significantly higher number of aerial images to be captured. Air America also expended significant time, effort and money to develop hiring and training processes and criteria for pilots and mechanics, its training materials, fleet management and logistics procedures, engineering data, flight school operations, and its customer, government, pilot, and mechanic relationships.

131. In addition, Air America developed the methodology of installing the Spookfish Pod on a Piper Aztec. Air America expended significant time, effort and money to develop the methodology for installing the Spookfish Pod on a Piper Aztec.

132. Neither Air America fleet management techniques, maintenance techniques and logistic procedures nor the method for installing the Spookfish Pod on a Piper Aztec are a matter of general knowledge or otherwise publicly available, but rather are proprietary to Air America and constitute trade secrets.

133. Air America provided Pictometry, Eagleview, and Mr. Sherwood with access to its trade secrets and other confidential information with the understanding that Pictometry and Eagleview would keep that information secret.

134. Eagleview and Mr. Sherwood misused and/or wrongfully acquired Air America's trade secrets and confidential information and used Air America's trade secrets and confidential

information to launch Sandhills and so that Pictometry and Eagleview could install a Spookfish Pod on a Piper Aztec, *i.e.*, the Sandhills Pod Aircraft. The improper use of these trade secrets has been ongoing since they were first misappropriated and continues today.

135.    Eagleview, Sandhills, and Mr. Sherwood's wrongful acquisitions amount to misappropriation through improper and unlawful means, including but not limited to theft, and were intentional, knowing, willful, malicious, fraudulent, and oppressive.

136.    The methodologies devised by Air America for flight management and for installing the Pod derive actual and potential independent economic value from not being generally known, and not being readily ascertainable through proper means by another person who can obtain economic value from disclosure or use of such information, such as Pictometry, Eagleview, Sandhills, Mr. Sherwood or other competitors of Air America who Pictometry and Eagleview share the information with for purposes of managing a fleet of aircraft and/or installing additional Spookfish Pods.

137.    The improper use of these trade secrets has been ongoing since they were first misappropriated and continues today. As a direct and proximate cause of the actions of Eagleview, Sandhills, and Mr. Sherwood, Air America has suffered and continues to suffer damages, including the opportunity to fly Spookfish Pods for Pictometry or opportunities to license or otherwise collect a royalty for Pictometry's, Eagleview's, Sandhills' and Mr. Sherwood's use of the method developed by Air America for installing the Pod on a Piper Aztec.

138.    As a result, Air America has been damaged in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**BREACH OF THE DUTY OF LOYALTY**
(As Against Steven Sherwood)

139.    Air America repeats and restates the above stated allegations as if fully restated herein.

140.    From October 8, 2012 to October 9, 2014, Mr. Sherwood was Air America's Assistant Director of Business Development.

141.    By virtue of his position with Air America, Mr. Sherwood owed a duty of loyalty to Air America.

142.    During the course of Mr. Sherwood's employment with Air America, Mr. Sherwood engaged in disloyal acts including, but not limited to, making arrangements with Pictometry and Eagleview to start a competing business with Air America and to divert revenue to himself.  Mr. Sherwood did this by, among other things, stealing Air America's confidential information, technical know-how, flight and maintenance techniques and personnel to provide Pictometry services.

143.    Mr. Sherwood's disloyal acts directly harmed and damaged Air America because Pictometry business was diverted from Air America to Sandhills in an amount to be determined at trial, but no less than $7.4 million.

**FOURTH CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF THE DUTY OF LOYALTY**
(As Against Eagleview, Sandhills and Steven Sherwood)

144.    Air America repeats and restates the above stated allegations as if fully restated herein.

145.    From October 8, 2012 to October 9, 2014, Mr. Sherwood was Air America's Assistant Director of Business Development.

28

146.    By virtue of his position with Air America, Mr. Sherwood owed a duty of loyalty to Air America.

147.    During the course of Mr. Sherwood's employment with Air America, Mr. Sherwood engaged in disloyal acts including, but not limited to, making arrangements with Eagleview to start a competing business with Air America and to divert revenue to himself.  Mr. Sherwood did this by, among other things, stealing Air America's confidential information, technical know-how, flight and maintenance techniques and personnel to provide Pictometry services.

148.    Eagleview and Sandhills provided substantial assistance (financial and otherwise) and encouraged Mr. Sherwood to breach his duty of loyalty to Air America.  On information and belief, Eagleview provided significant financial support to Mr. Sherwood in setting up Sandhills. Eagleview also executed their plan for Sandhills and/or Mr. Sherwood to provide services to Pictometry and Eagleview consistent with the same services Air America provided to Pictometry under the ASA.

149.    In assisting Mr. Sherwood, Eagleview and Sandhills knew that Mr. Sherwood was breaching his duty of loyalty to Air America.

150.    Mr. Sherwood's disloyal acts, performed at the direction, substantial assistance and encouragement of Eagleview and Sandhills, directly harmed Air America because Pictometry business was diverted from Air America to Sandhills in an amount to be determined at trial, but no less than $7.4 million.

**FIFTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(As Against Steven Sherwood)**

151.    Air America repeats and restates the above stated allegations as if fully restated herein.

152.    From October 8, 2012 to October 9, 2014, Mr. Sherwood was Air America's Assistant Director of Business Development.

153.    Air America entrusted Mr. Sherwood with secret information and senior responsibilities within Air America.

154.    Mr. Sherwood owed a fiduciary duty to Air America.

155.    During the course of Mr. Sherwood's employment with Air America, Mr. Sherwood breached his fiduciary duty to Air America by engaging in the following acts, including, but not limited to, making arrangements with Eagleview to start a competing business with Air America and to divert revenue to himself.  Mr. Sherwood did this by, among other things, stealing Air America's confidential information, technical know-how, flight and maintenance techniques and personnel to provide Pictometry services.

156.    Mr. Sherwood was the direct and proximate cause of Air America's harm because Mr. Sherwood worked with Eagleview to found Sandhills as a direct competitor of Air America and Mr. Sherwood used the information he stole from Air America to divert Pictometry business to Sandhills.

157.    As a result, Air America has been damaged in an amount to be determined at trial, but no less than $7.4 million.

30

### SIXTH CAUSE OF ACTION
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (As Against Eagleview and Sandhills)

158. Air America repeats and restates the above stated allegations as if fully restated herein.

159. From October 8, 2012 to October 9, 2014, Mr. Sherwood was Air America's Assistant Director of Business Development.

160. Mr. Sherwood owed a fiduciary duty to Air America.

161. Mr. Sherwood breached his fiduciary duty to Air America during his employment, by working with Air America's biggest customer to start a competing business and divert revenue to himself, and stealing Air America information and personnel.

162. Eagleview substantially assisted and encouraged Mr. Sherwood to breach his fiduciary duties to Air America by opening Sandhills and stealing information and personnel in order to do so.

163. Sandhills publicly touted that Pictometry and Eagleview directed Mr. Sherwood to open Sandhills.

164. Air America was harmed because, at the direction, substantial assistance and encouragement of Eagleview, Mr. Sherwood breached his fiduciary duty to Sandhills by conspiring with Air America's biggest customer to start a competing business and divert revenue to himself, and stealing Air America information and personnel.

165. As a result, Air America has been damaged in an amount to be determined at trial, but no less than $7.4 million.

31

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE FLORIDA DECEPTIVE TRADE**
**AND UNFAIR PRACTICES ACT**
**(As Against Eagleview, Sandhills and Steven Sherwood)**

166.    Air America repeats and restates the above stated allegations as if fully restated herein.

167.    Eagleview, Sandhills and Mr. Sherwood worked together in an effort to harm Air America using the skills and know-how Mr. Sherwood learned as a senior manager of Air America to start a competing business and divert revenue to himself through Sandhills.

168.    Eagleview, Sandhills and Steven Sherwood used deceptive and unfair practices to steal confidential information from Air America, to steal senior managers, to steal pilots and conspire to open up a competing business.

169.    The unfair acts and deceptive practices were committed during the course of trade and commerce.

170.    The deceptive and unfair practices leading to the opening of Sandhills directly and proximately harmed Air America because they diverted Pictometry business away from Air America.

171.    Air America suffered actual damages in an amount to be determined at trial, but no less than $7.4 million, because it lost revenue to Sandhills from the business from Pictometry and other customers.

**JURY DEMAND**

Air America demands a jury trial on all claims and issues that are triable by jury.

32

## **REQUEST FOR RELIEF**

WHEREFORE, with respect to Air America's claims against Eagleview, Sandhills and Mr. Sherwood;

 (a) Enter judgment for Air America and against Eagleview, Sandhills, and Mr. Sherwood;

 (b) Award damages to Air America on Air America's Claims 1-2, in an amount to be determined at trial;

 (c) Award damages to Air America on Air America's Claims 3-7, in an amount to be determined at trial, but no less than $7.4 million;

 (d) Permanently enjoin Eagleview, Sandhills, and Mr. Sherwood from using Air America's fleet management techniques and/or Air America's method for installing the Pod on a Piper Aztec;

 (e) Attorney's fees and costs;

 (f) Pre-judgment and post-judgment interest, as applicable; and

 (g) Any other relief the Court deems just and proper.

Dated: New York, New York
September 4, 2018

*s/ Michael R. Huttenlocher*
Michael R. Huttenlocher
Joseph B. Evans
Greer Griffith
**McDERMOTT WILL & EMERY LLP**
340 Madison Avenue
New York, New York 10173
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444
mhuttenlocher@mwe.com
jbevans@mwe.com
ggriffith@mwe.com

*Attorneys for Air America Flight Center, LLC*

33